UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHRISTOPHER W. RAINWATER                                    PLAINTIFF

VS.                              CIVIL ACTION NO. 3:12CV689TSL-JMR

L-3 COMMUNICATIONS VERTEX
AEROSPACE, LLC                                             DEFENDANT

MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendant L-3 Communications Vertex Aerospace (L-3) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Christopher W. Rainwater has responded to the motion and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes the motion is well taken and should be granted.

Plaintiff Rainwater filed the present action complaining of alleged disability discrimination in violation of the Americans With Disabilities Act, 42 U.S.C. § 12132 (ADA), and contending specifically that defendant L-3 withdrew an offer of employment on account of plaintiff's disability. The following facts pertinent to his claim are undisputed. Defendant L-3 is a governmental contractor that provides aviation and aerospace services to the United States Department of Defense. During the relevant time period, L-3 contracted with Aerotek Staffing Agency to perform

human resource functions, and it contracted with Occu-Med to conduct needed pre-employment medical services.

According to plaintiff's complaint, and as the record evidence confirms, in August 2011, plaintiff applied for a position with defendant as an AH64 Helicopter Repair Technician. On August 24, 2011, he was extended a conditional offer of employment, which was specifically conditioned upon his meeting the CENTCOM[1] "Minimal Standards of Fitness for Deployment" (Minimal Standards) established by the United States Department of Defense.  The Minimal Standards set forth a nonexhaustive list of medical conditions, including emotional and psychiatric conditions that, absent a waiver by CENTCOM, "may be sufficient to deny medical clearance for or to disapprove deployment of a ... contractor's employee."  The Minimal Standards also provide that the use of certain listed medications "is disqualifying for deployment, unless a waiver is granted."  Included in the list of such medications is "Valproic acid (Depakote®....)."  Under the Minimal Standards, individuals with apparently disqualifying conditions could still be deployed based upon an individualized medical assessment, waiver submission and disposition by the appropriate CENTCOM waiver authority; and it defines with

_____

[1]    CENTCOM stands for United States Central Command—the United States' military command in the Middle East.

specificity the circumstances that must exist in order for a
waiver to be considered.

During plaintiff's medical certification process, which was
handled by Occu-Med, he disclosed to Occu-Med's examiner that he
was taking Divalproex, a generic for Depakote, a prohibited
medication under the Minimal Standards.  Moreover, his medical
records which were reviewed as part of the certification process,
disclosed that plaintiff had sought treatment for a mood disorder.
In early October 2011, following its evaluation of plaintiff,
Occu-Med submitted an application for medical waiver to CENTCOM.
The application reported plaintiff's use of Divalproex and the
fact that he had been evaluated for a mood disorder, the treatment
for which included supportive counseling and medications for
anxiety and sleep, including Depakote (Divalproex) and Hydrozine.
Although Occu-Med reported that "[p]atient currently appears
stable and is able to perform his job appropriately on medications
and counseling," CENTCOM denied the waiver application, stating,
"cannot waiver antimanic/bipolar agent for use w/ depression,
would require more detailed history regarding diagnosis and
medication use."

Upon denial of the first application, Occu-Med promptly
submitted a second application for waiver, providing a brief
synopsis of plaintiff's mental health diagnosis and treatment,
along with plaintiff's medical records beginning in 2010, when he

3

was first diagnosed with and began treatment for mental health conditions.  Following review by CENTCOM medical personnel, CENTCOM denied the second application, stating, "cannot waiver given r/x bipolar do, as well as significant symptomology with condition that could destabilize without specialist treatment in theater."  Upon CENTCOM's denial of the second waiver request, L-3 revoked its conditional offer of employment to plaintiff.

Plaintiff states that while he was informed that he would not be hired because the request for a medical waiver had been denied, he was not told why the waiver had been denied.  Therefore, he went to Jack Harris, L-3's hiring representative employed by Aerotek.  Plaintiff states that Harris failed and/or refused to give him copies of the waiver requests so that plaintiff could ascertain the reason for denial.[2]  Further, according to plaintiff, Harris told him that defendant would not make any further attempt to obtain a waiver for him, so the only way he

---

[2]     While plaintiff's affidavit characterizes Harris as having "refused" to provide him copies of the waiver requests, plaintiff testified in his deposition that when he asked for copies of the documents from Harris, "Harris said that Occu-Med had them," and when he asked Occu-Med, "Occu-Med said that ... L-3 had them."  When asked later in his deposition whether he ever requested an explanation from "anybody affiliated with L-3 why you were unable to get the waivers when they were submitted by Occu-Med, "plaintiff responded that he "requested the information from Jack Harris who said he would attempt to get them for me but never followed up."  Based on plaintiff's deposition testimony, and contrary to the characterization in his affidavit, it does not appear that Harris or anyone else affiliated with L-3 "refused" to provide plaintiff with copies of the denied waiver applications.

4

could be hired would have been for him to get off his medication so that no waiver would be necessary.  Plaintiff states that this was not an option, since the only way he could have gotten off his medication would be for him to falsely claim to his doctor that he no longer had the psychiatric symptoms that caused his disability.

Following the revocation of his offer of employment, plaintiff thereafter filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging disability discrimination under the ADA.  After filing his EEOC charge, plaintiff requested and obtained a copy of the denied medical waiver requests from the Department of Defense, following which he submitted his own application to CENTCOM for a medical waiver.  Plaintiff testified in his deposition that his first application was denied due to a note in his medical records which indicated that his physician wanted to conduct testing for bipolar disorder.  After requesting and obtaining a letter from his doctor stating that bipolar was not present, plaintiff submitted a second waiver application accompanied by the letter.  The application was approved.[3]

The ADA prohibits "discriminat[ion] against a qualified individual with a disability because of the disability ... in regard to job application procedures, the hiring, advancement or

---

[3]    The approval recited: "Last waiver denied ?bipolar diagnosis recent doctors appointed completed with clarification that bipolar was never diagnosed."

discharge of employees, employee compensation, job training; and

other terms, conditions, and privileges of employment." 42 U.S.C.

§ 12112(a). When a plaintiff relies on circumstantial evidence to

prove disability discrimination in violation of the ADA, the court

applies the burden-shifting framework of McDonnell Douglas.

McInnis v. Alamo Comm. College Dist., 207 F.3d 276, 279 (5th Cir.

2000).

> Under this framework, a plaintiff must first make a
> *prima facie* showing of discrimination by establishing
> that: (1) He is disabled or is regarded as disabled; (2)
> he is qualified for the job; (3) he was subjected to an
> adverse employment action on account of his disability;
> and (4) he was replaced by or treated less favorably
> than non-disabled employees. Once the plaintiff makes
> his *prima facie* showing, the burden then shifts to the
> defendant-employer to articulate a legitimate,
> non-discriminatory reason for the adverse employment
> action. Once the employer articulates such a reason,
> the burden then shifts back upon the plaintiff to
> establish by a preponderance of the evidence that the
> articulated reason was merely a pretext for unlawful
> discrimination.

Id. at 279-80 (citations and footnotes omitted). See also Shirley

v. Precision Castparts Corp., 726 F.3d 675, 679-80 (5th Cir. 2013)

(stating that a *prima facie* case under the ADA "requires a

plaintiff to show that he (1) has a disability; (2) was qualified

for the job; and (3) was subject to an adverse employment decision

because of his disability.").

L-3 contends plaintiff cannot establish a *prima facie* case

because the evidence establishes beyond dispute that he was not

qualified for the position in question and because plaintiff

cannot show that any similarly situated non-disabled person was treated more favorably.[4] L-3 further contends that even if plaintiff could establish the elements of his *prima facie* case, he cannot demonstrate that L-3's articulated legitimate nondiscriminatory reason for the challenged employment decision was pretext for disability discrimination.

To be found "qualified" for a position, an individual must satisfy "the requisite skill, experience, education and other job-related requirements of the employment position...." 29 C.F.R. § 1630.2(m). A requirement of the position at issue was compliance with the Minimal Standards, which in plaintiff's case meant that a medical waiver from CENTCOM was necessary. Plaintiff admits this. He also admits that at the time the job offer was revoked, the requisite waiver had not been obtained. Yet plaintiff contends that he was qualified for the position (or perhaps that he should be deemed qualified) because he actually did qualify for a CENTCOM waiver (as evidenced by the fact that he was eventually able to obtain a waiver), and because the only reason he did not have the necessary waiver at the time the job offer was withdrawn was due to L-3's failure to take the steps needed to secure a waiver. That is, he claims that had L-3, through its agent Occu-Med, submitted an accurate and complete waiver request in a timely

---

[4] L-3 does not deny that plaintiff could establish that he suffers from a disability or that he suffered an adverse employment action.

manner, he would have met all the requirements for the position.

Plaintiff further argues that he was treated less favorably than similarly-situated non-disabled persons, though the court is unable to follow his reasoning in support of this assertion. Plaintiff first declares that "[n]on-disabled employees of Defendant are not required to get medical waivers because they are not disabled." Yet under the Minimal Standards, the requirement of a medical waiver does not apply only to disabled persons. On the contrary, the Minimal Standards include many deployment-disqualifying conditions which would not necessarily result in disability; and yet the Mininal Standards mandate that every individual with a disqualifying condition must obtain a medical waiver, without regard to whether the condition is disabling within the meaning of the ADA.[5] Plaintiff has certainly not presented evidence that defendant undertook greater efforts to secure waivers for non-disabled individuals than it did for him.

Moreover, while plaintiff avers that the waiver applications submitted by Occu-Med, on behalf of L-3, were false and/or inaccurate and incomplete, he has not alleged or sought to demonstrate that Occu-Med submitted such allegedly false and/or inaccurate or incomplete waiver requests because of plaintiff's

---

[5]     Whether a condition causes a disability within the ADA definition may bear on whether a waiver is granted, but the employer has no control over whether CENTCOM grants or denies a waiver request.

disability.  On the contrary, plaintiff has characterized Occu-Med's actions in this regard as negligence.  In his deposition, plaintiff theorized that Occu-Med was unable to get his waiver requests approved because it did not understand fully the conditions for deployment so that it could properly apply for a waiver and that Occu-Med was thus "negligent in the waivers themselves to provide [his] actual diagnosis."  Plaintiff expressed that he did not believe that Occu-Med "reviewed the conditions that were sent down by CENTCOM for individuals deploying overseas to understand what is an approved medical condition and what is not an approved medical condition and the appropriate way to submit an MOD 10 waiver form."  Thus, even if it were the case that "[n]on-disabled employees of Defendant are not required to get medical waivers because they are not disabled[,]" plaintiff has presented no evidence to suggest that L-3, through Occu-Med, submitted an inadequate waiver request on plaintiff's behalf "because of" his disability.

Plaintiff next argues that by telling him he could only be hired if he was no longer taking Divalproex, L-3, through its agent, "was clearly requiring [him] to claim he was no longer disabled to his doctor as a condition to be hired" and thus requiring that he "pretend to not be disabled."  He concludes that in this manner, he was treated less favorably than non-disabled prospective employees, who "do not have any chance of the

9

Defendant requiring them to pretend to be something they are not"
in order to be hired.  There is no merit in this argument.  It is
an established fact that as long as plaintiff was taking
Divalproex, he could not be deployed overseas and therefore,
absent a waiver by CENTCOM, he did not meet the requirements for
the position in question and would not be hired for the position.
At the time of Harris's alleged statement, CENTCOM had already
denied two waiver requests and L-3 did not intend to submit
another waiver application.  Thus, merely telling plaintiff that
the only way he could get the job was if he were not taking the
Divalproex so that no waiver would be required cannot reasonably
be characterized as "requiring" plaintiff to "pretend to not be
disabled" as a condition of being hired.  Plaintiff plainly has
not shown that he was treated less favorably than non-disabled
prospective employees.  For this reason, summary judgment is in
order.

Even if the court were to assume that plaintiff could
establish a *prima facie* case, though, defendant still would be
entitled to summary judgment.  Defendant asserts as its
legitimate, nondiscriminatory reason, that plaintiff was not
qualified for the position without a medical waiver and the
requests for a medical waiver had been denied.  Plaintiff appears
to take the position that defendant made no genuine effort to get
a medical waiver, as evidenced not only by the fact that the
waiver applications submitted by Occu-Med were false and

10

incomplete, but also by the fact that defendant, through its
agents, refused to provide plaintiff with information he needed to
get a waiver on his own.  He suggests that had L-3 made a
reasonable and genuine effort to secure a waiver or to assist in
his efforts to get a waiver, then a waiver could have been timely
obtained, as indicated by the fact that he was in fact ultimately
successful in receiving a waiver.  He concludes that defendant's
failure to make such effort tends to show that defendant's
purported reliance on the denial of the waiver applications as a
basis for withdrawing its offer of employment is pretext for
disability discrimination.

     The evidence does not support plaintiff's assertion that
Occu-Med, on behalf of L-3, failed to make a reasonable effort to
obtain a waiver for plaintiff.[6]  The undisputed evidence of record
establishes that Occu-Med submitted with the second waiver request
all of the medical records that had been provided by plaintiff,
and it requested that CENTCOM undertake a complete review of the
records in evaluating the request for a waiver.  After that
request was denied, plaintiff again submitted those very same
records to CENTCOM with his first waiver request; and that request
was also denied.  Plaintiff was only able to secure CENTCOM's
approval of his waiver request after getting a letter from his

_____

     [6]    The court expresses no opinion as to whether it was
required to do so.  The court finds only that there is no evidence
that Occu-Med acted negligently, much less that it, or more
pertinently, L-3, acted with discriminatory intent.

11

doctor clarifying that plaintiff had not been diagnosed with bipolar disorder and submitting that letter to CENTCOM with yet another waiver application.  That Occu-Med failed to go to such lengths to obtain a waiver for plaintiff cannot reasonably be found to evidence pretext.  Moreover, contrary to plaintiff's characterization, there is no evidence that L-3, directly or through an agent, refused to provide plaintiff with information he needed to seek a waiver on his own.

In the court's view, the ADA did not require defendant to do any more than it did in its attempt to get plaintiff cleared by the Department of Defense for deployment; and its actions, and those of its agents, are not suggestive in the least of pretext. Accordingly, it is ordered that defendant's motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 27th day of January, 2014.


                              /s/ Tom S. Lee
                              UNITED STATES DISTRICT JUDGE

12